
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 1:20cr16-MR-WCM |
| | ) | |
| | ) | **BILL OF INDICTMENT** |
| v. | ) | |
| | ) | Violations: |
| | ) | |
| | ) | 15 U.S.C. § 78j(b) |
| | ) | 15 U.S.C. § 80b-6 |
| MARK NICHOLAS PYATT | ) | 17 C.F.R. § 240.10b-5 |
| a/k/a DANIEL G. RANDOLPH | ) | 18 U.S.C. § 1343 |
| | ) | 18 U.S.C. § 1957 |

**THE GRAND JURY CHARGES:**

INTRODUCTORY PARAGRAPHS

*Background*

1. Beginning at least as early as October 2017, and continuing through at least as late as February 2019, in Haywood County, North Carolina, and elsewhere, the defendant MARK NICHOLAS PYATT, often going by the alias DANIEL G. RANDOLPH, engaged in a scheme to defraud victims by inducing them to invest in a purported "communal account," or "fund," to be managed by PYATT.

2. Instead of managing the investments as he promised he would, PYATT stole the vast majority of the investors' money. PYATT stole over $100,000 to pay for personal expenses, including jewelry, groceries, cigars, and a Chevrolet Corvette. PYATT also withdrew tens of thousands of dollars in cash, and made several lulling payments to his investors, falsely implying that the returned funds were trading profits.

*The Scheme*

3. At all times relevant to this Bill of Indictment, PYATT, who often went by the alias DANIEL G. RANDOLPH, conducted business through a North Dakota-registered company named WINSTON REED INVESTMENTS, LLC ("WRI").

1

4. Beginning at least as early as October 2017, PYATT began to solicit friends and acquaintances to invest their money in a "communal account," or "fund," held by WRI. PYATT represented to his investors that he had made significant amounts of money through his own investing and day trading activities, and that he wanted to invest their money using a similar strategy, so that they could experience the same wealth that he enjoyed.

5. PYATT signed investors up for the WRI fund using a document titled "Investment Agreement and Guidelines with Winston Reed Investments LLC," hereinafter referred to as the "Investment Contract."

6. Through the Investment Contract, PYATT represented to his investors:

(a) That the investors' money would be placed into "the TD Ameritrade account" for the WRI fund, and that PYATT would then "trade via the 'think or swim' platform[,]" adding that "these trades shall be done daily, mon-fri, at a minimum of 50 weeks per annum";

(b) That PYATT would "be trading 'futures' and 'forex' in a day-trading format and will specialize in energy related stocks" and "Gold, NASDAQ, and oil";

(c) That "the low average expected return on investments across the board is 15% per month[,]" and that "WRI's goal is to give a return of 100% in 3 to 4 months"; and

(d) That "by signing this agreement both parties agree to a 'good faith measure' of business conduct. In good faith, WRI, [sic] agrees to use all knowledge and strategies to make a positive gain for the investors."

7. In addition, through the Investment Contract, PYATT represented that "the fee for the services of WRI is to be 10% of all gains," that "this percentage only applies to monies gained for the investor," that "there are no fees if I do not make a profit for you," and that "there are no monthly fees for services rendered," other than a $300 monthly fee for an outside stock analyst.

8. All of the foregoing were misrepresentations, which PYATT made in order to induce his investors to provide their funds to PYATT in connection with the purported purchase or sale of a security, that being the "Investment Contract" with WRI. PYATT had no basis for projecting such optimistic returns, and PYATT did not intend to manage the investors' money in the manner described by the Investment

Contract. In truth and in fact, PYATT intended to misappropriate, and did misappropriate, the vast majority of his investors' money.

*Local Victims*

9. From late 2017 through early 2019—for much of the duration of the scheme—PYATT, often going by the alias DANIEL G. RANDOLPH, resided in Haywood County, North Carolina. While residing in Haywood County, PYATT used false statements to swindle local victims into investing in his fund.

10. For example, on or about October 10, 2017, C.B., a Haywood County resident, in reliance on PYATT's representations contained in the Investment Contract described above, signed a copy of the Investment Contract and sent PYATT a $10,000 investment by means of interstate wire.

11. Instead of managing the investment as he promised he would, PYATT stole the vast majority of C.B.'s money.

12. Similarly, on or about December 5, 2018, C.A., a Haywood County resident, in reliance on PYATT's representations contained in the Investment Contract described above, signed a copy of the Investment Contract and sent PYATT a $5,000 investment by means of interstate wire. At the same time, C.A. agreed to let PYATT rent a home owned by C.A., and located in Haywood County, free of charge, in exchange for PYATT's promise to invest an additional $15,000 of his own money into the WRI fund on C.A.'s behalf.

13. Instead of proceeding as he promised he would, PYATT never made the additional $15,000 investment on C.A.'s behalf, and PYATT misappropriated the vast majority of C.A.'s $5,000 investment.

*Misrepresentations Regarding Fund Performance*

14. PYATT's misrepresentations were not limited to the Investment Contract itself. For several months after obtaining their funds, PYATT provided his investors with regular monthly updates that purported to describe his trading activity and the considerable positive returns he was earning on their investments. For example:

(a) On or about November 10, 2017, shortly after C.B. invested, PYATT sent an email to C.B. and his other investors telling them, "This month was a great one, one for the record books actually!" PYATT provided details about his purported trading activity, reported substantial trading gains and losses,

3

and reported a net gain of 44.9% on the month—approximately $2,244 per $5,000 "investment contract." PYATT reported achieving these results for his investors by trading options on stocks.

(b) On or about December 12, 2017, PYATT sent an email to C.B. and his other investors telling them, "I absolutely murdered it, killed it... CRUSHED IT[,]" and explaining that "[t]rading this new stock of SOXL has proven to be worth the time and it has paid us in dividends!" PYATT told his investors he had achieved an 86.5% net gain on their investments for the month.

(c) On or about January 10, 2018, PYATT sent an email to C.B. and his other investors telling them that he had achieved a 47.95% monthly return using an "auto-trading" platform that could "trade smaller trades all day long whereas [PYATT acting manually] was only trading a few hours each morning."

15. These updates, and other similar ones that PYATT sent to his investors, were false. While PYATT did place some futures trades using investor funds early in the scheme, those trades generated net portfolio-level losses of over $13,000, rather than the extreme net monthly gains PYATT reported to his investors. Moreover, PYATT never placed many of the stock trades he reported in his monthly updates to his investors at all. In truth and in fact, PYATT was misappropriating the investors' money.

16. Eventually, in February 2019, after reporting substantial monthly gains for more than a year, PYATT notified his investors by email that a "complete and catastrophic" loss had occurred, and that their money was gone. PYATT claimed that he was investigating the loss with the assistance of a forensics firm, and PYATT told his investors that the loss was due to a failure by TD Ameritrade, the brokerage firm holding the investment account, to execute a stop loss order.

17. PYATT's explanation for the depletion of the account was false. The investors' money was not gone because of an error on the part of TD Ameritrade. The investors' money was gone because PYATT misappropriated it.

18. PYATT sent each of the email communications described above, and others like them, to all of his investors, including both his investors located within the State of North Carolina and his investors located in other states.

19. PYATT's email communications to his investors constituted writings, signs, and signals transmitted by means of wire in interstate commerce.

4

### *The Corvette*

20. On or about December 31, 2018, PYATT, using his real name, purchased a 2007 Chevrolet Corvette from Sunrise Camping Center, a business engaged in automobile sales, which is located in Hickory, North Carolina.

21. PYATT paid approximately $18,499 for the vehicle, consisting of a $4,500 charge to the debit card for the account holding his investors' money, and $13,999 in cash, also drawn from the account holding his investors' money.

22. All of the money PYATT used to purchase the Corvette constituted criminally derived property, and all constituted proceeds of the wire fraud and securities fraud offenses described herein.

### *Conclusion*

23. In the manner and means described above, PYATT defrauded his victims. PYATT induced his victims to invest by misrepresenting what he would do with their money, and, once he had his victims' money, PYATT misrepresented the status of it. For months, PYATT represented to his investors that he was trading in stocks and other financial instruments on their accounts, and earning significant returns, when in reality he was spending their money on personal expenses.

### CHARGING PARAGRAPHS

### COUNT ONE
### Wire Fraud
### 18 U.S.C. § 1343

24. Paragraphs 1 through 23 are incorporated herein, and the Grand Jury further alleges that:

25. Beginning at least as early as October 2017, and continuing through at least as late as February 2019, in Haywood County, North Carolina, within the Western District of North Carolina, and elsewhere, the defendant,

### MARK NICHOLAS PYATT
### a/k/a DANIEL G. RANDOLPH

with the intent to defraud, did knowingly and intentionally devise the above-described scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and, for the purpose of executing such

5

scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce any writing, signal, and sound, to wit, the defendant, while located in Haywood County, North Carolina, did send interstate emails, text messages, and wire transfers to victims and did cause victims to send interstate emails, text messages, and wire transfers to him.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT TWO
## Securities Fraud
## 15 U.S.C. § 78j(b)

26. Paragraphs 1 through 23 are incorporated herein, and the Grand Jury further alleges that:

27. Beginning at least as early as October 2017, and continuing through at least as late as February 2019, in Haywood County, North Carolina, within the Western District of North Carolina, and elsewhere, the defendant,

## MARK NICHOLAS PYATT
## a/k/a DANIEL G. RANDOLPH

willfully, directly and indirectly, by use of the means and instrumentalities of interstate commerce and the mails, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would and did operate as a fraud and deceit upon investors and others, in connection with the sale of securities, to wit: investments in the "communal account" or "fund" offered by PYATT, as set forth above.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

6

# COUNT THREE
## Investment Adviser Fraud
## 15 U.S.C. § 80b-6

28. Paragraphs 1 through 23 are incorporated herein, and the Grand Jury further alleges that:

29. At all relevant times, **MARK NICHOLAS PYATT, a/k/a DANIEL G. RANDOLPH** was an "investment adviser" within the meaning of 15 U.S.C. § 80b-2(a)(11), and:

30. Beginning at least as early as October 2017, and continuing through at least as late as February 2019, in Haywood County, North Carolina, within the Western District of North Carolina, and elsewhere, the defendant,

## MARK NICHOLAS PYATT
## a/k/a DANIEL G. RANDOLPH

unlawfully, willfully, and knowingly, by the use of the mails and means and instrumentalities of interstate commerce, directly and indirectly, did: (a) employ devices, schemes, and artifices to defraud clients and prospective clients; (b) engage in transactions, practices, and courses of business which operated as a fraud and deceit upon clients and prospective clients; and (c) engage in acts, practices, and courses of business that were fraudulent, deceptive, and manipulative.

All in violation of Title 15, United States Code, Sections 80b-6 and 80b-17.

# COUNT FOUR
## Money Laundering
## 18 U.S.C. § 1957(a)

31. Paragraphs 1 through 23 are incorporated herein, and the Grand Jury further alleges that:

32. On or about December 31, 2018, in Catawba County, North Carolina, within the Western District of North Carolina, the defendant,

## MARK NICHOLAS PYATT
## a/k/a DANIEL G. RANDOLPH

did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000, that is, in the transfer of funds to Sunrise Camping Center, such property having been derived from the specified unlawful activities of wire fraud and securities fraud, as set forth above.

All in violation of Title 18, United States Code, Section 1957(a).

NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C).

The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

a. All property which constitutes or is derived from proceeds of the violations set forth in this Bill of Indictment; and

b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

The following property is subject to forfeiture on one or more of the grounds stated above:

a. A forfeiture money judgment in the amount of at least $218,000, such amount constituting the proceeds of the violations set forth in this Bill of Indictment;

8

b.  The 2007 Chevrolet Corvette purchased by PYATT from Sunrise Camping Center in Hickory, North Carolina, on or about December 31, 2018.

A TRUE BILL:

GRAND

R. ANDREW MURRAY
UNITED STATES ATTORNEY

DANIEL V. BRADLEY
ASSISTANT UNITED STATES ATTORNEY